

# FILED

MAY 0 5 2026

Heidi D. Campbell, Clerk
U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| CURT AND KATHLEEN LAWRENCE | ) |
| | ) |
| Plaintiffs/Complainants | ) Case No: 26 CV 263 CVE - SH |
| | ) |
| v. | ) |
| | ) |
| EASTERN SHAWNEE TRIBE OF OKLAHOMA | ) |
| WOODLANDS HOUSING DIRECTOR, | ) |
| (1) KIM LAUGHLIN, | ) |
| | ) |
| | ) |
| | ) |
| Defendants | ) |
| | ) |

### PETITION FOR COMPLAINT OF DISCRIMINATORY HOUSING PRACTICES AND INJUNCTIVE RELIEF UNDER THE FAIR HOUSING ACT 42 USC 3601 et seq.

Plaintiffs/Complainants are Eviction Defendants/Tenants Curtis and Kathleen Lawrence, ages 72 and 69 respectively and are seeking relief, primarily an injunction 42 USC 3613 (c) (1) (d) and an investigation 42 USC 3611 (a) into this arbitrary, unjust and discriminatory wrongful eviction from the tribal Elder Housing of the Eastern Shawnee Tribe of Oklahoma (known as the "Woodlands") where they have leased on fee land for nearly four years. Kathleen Lawrence, is a late-stage Parkinson's patient who is largely confined to a bed and wheelchair is seeking injunctive relief to avoid further irreparable harm. Kathleen Lawrence moved into the small disability equipped duplex to avoid admission to a nursing home because the duplex unit is handicap accessible with a safe room and easy access to the bathroom. The safe room is significant because Kathleen, who cannot be left alone without care, is virtually paralyzed after 9:00 p.m. when her medication wears off. Also, by virtue of Curt Lawrence's tribal membership, Kathleen Lawrence receives a noon meal delivered through the tribal Title VI Agency On Aging food program (AOA) on days that the tribal offices are open.

The Eastern Shawnee Tribe (ESTO) Housing Program is more of a social program for tribal elders than an economic enterprise. ESTO has prioritized ESTO tribal preference for renting the Woodlands, followed by Indian preference for members of other tribes when there is a vacancy with no ESTO citizen available on the wait list.

**ESTO WOODLANDS HAS DISCRIMINATED BY REFUSING TO MAKE REASONABLE ACCOMMODATIONS TO RULES, POLICIES AND PRACTICES UNDER THE FAIR HOUSING ACT REGARDING DISABLED TENANT KATHLEEN LAWRENCE**

1. The unexpected arbitrary and hasty "Notice to Quit" the premises has created a hardship on Defendant/Tenants to find handicap accessible and suitable replacement accommodations due to her particular disability and symptoms.

2. Finding a comparable dwelling in this area is difficult in a hasty and arbitrary eviction. "For purposes of this subsection, discrimination includes—" (B) "a refusal to make reasonable accommodations in **rules, policies, practices or services,** when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling;" 42 USC 3604 (F) (3) (B) (Bold Type Emphasis added.)

**WHILE ESTO COULD ARGUE THAT THERE IS NO REMEDY UNDER STATE OR TRIBAL LAW FOR THE DISCRIMINATORY WRONGFUL EVICTION OF CURT LAWRENCE, ESTO HAS BLATANTLY DISCRIMINATED AGAINST TENANT KATHLEEN LAWRENCE BY NOT ONLY REFUSING TO MAKE REASONABLE ACCOMMODATIONS TO RULES, POLICIES AND PRACTICES UNDER THE FAIR HOUSING ACT BUT HAS ALSO VIOLATED LEASE TERMS AND DUE PROCESS PROMISES CONTAINED IN THE GRIEVANCE POLICY**

1. Rules, policies and practices delineated in the yearly "Woodlands Eastern Shawnee Independent Living Rental Lease" (Lease) (**attached**), rather than being administered to make "reasonable accommodations" were both ignored and manipulated to force eviction to appease a politically powerful adjoining neighbor with a bizarre vendetta.

2. The "yearly" lease agreement defaults to a "month to month lease" which under pro-landlord Oklahoma law obviates key protections in the Woodlands Lease. Another person who had been a tenant familiar with housing regulations asked about the month-to-month lease and was assured that it wouldn't make any difference (in the terms of the lease). While a month-to-month lease may remove some lease terms from enforcement, the vague, ambiguous and ignored "The Woodlands Grievance Policy" remains in force although not enforced. State and tribal law does not preempt the Fair Housing Act.

3. Executed documents contained in the lease includes "The Woodlands Grievance Policy" which details what is ostensibly due process. Step 1 describes a meeting between the Department Director and Tenants. (The Woodlands Grievance Policy p.1 paragraph 3.) Such a meeting did not occur. An offer of a hearing came in the "Notice of Termination of Lease" letter dated February 6, 2026 Paragraph 3. See Exhibit 1 in the Defendant/Tenants, were offered a hearing before an impartial and "unbiased" board. Defendant/Tenants accepted Department Director Kristi Laughlin's offer for said hearing and appeared before a board of 5 of the Department Director's "unbiased" subordinate employees whose primary bias was to not displease their supervisor. Predictably, their vote was unanimous support of their supervisor. The Woodlands Grievance Policy stated

that "[I]f the resident desires further action, s/he may exercise his/her right to present his/her case before the appropriate administrative agency or before the appropriate court." (The Woodlands Grievance Policy item f.) When Defendant/tenants asked Kristi Laughlin, the newly assigned Department Director. to define the next step pertaining to "the appropriate administrative agency," she refused to answer the question and stated that she would be having "**no further discussion . . .**" (See Exhibit J.

## ESTO GOVERNMENT HAS ACTED TO REMOVE SUBSTANTIVE DUE PROCESS, VALID APPEAL PROCESSES PROMISED IN THE LEASE AND POLICIES OF THE WOODLANDS, RESULTING IN THE EXHAUSTION OF ALL TRIBAL REMEDIES

1. Reportedly, the ESTO Housing Authority Board ceased to exist over a month ago.

2. The only ESTO government authority above the administration of the ESTO Woodlands Elder Housing Program is the ESTO Business Committee. Curt Lawrence sent an email to Chief Wallace and the Secretary-Treasurer of the ESTO Business Committee, followed by a certified letter to the Secretary-Treasurer to appear before the Business Committee. There has been no response from either. All tribal remedies have been exhausted.

## CONCLUSION AND SUPPORTIVE FACTS

1. Curt Lawrence is a member and elected official of the Seneca-Cayuga Nation (SCN). He and other members of SCN worked for years at the neighboring tribe, ESTO. The 88 year-old and long-term ESTO Chief, Glenna Wallace, has frequently and reportedly still, makes disparaging remarks about SCN. Another indication of prejudice is the frequent retelling of, apparently her favorite story, that occurred during her college teaching career and the racially charged language that she uses. This story has been told multiple times in large tribal meetings. Wallace is authoritarian, to say the least, some use a harsher description. This discriminatory and egregious eviction is likely the result of discriminatory bias definitely motivated by animosity (See attached Affidavit).

2. On the fifth page, item 12, TERMINATION OF LEASE, "This Lease may be terminated by the Department at any time by giving a written notice. **Notice may only be given by serious and repeated violations of material terms of the Lease, such as failure to make payments due under the Lease** or to fulfill the Resident's obligations under the lease or for other good cause. There has been no material breach of the lease or repeated violations of material terms. A sworn affidavit detailing allegations and the bizarre vendetta of the adjoining neighbor will be attached if allowed.

3. Regarding the guest policy. Petitioner/Tenants have been compliant since June 2026 with one lapse since December 2024, when the two children's mother and grandmother passed away. Those instances were waived, but used now in an attempt to justify an unjust eviction. The vindictive neighbor, who had 3 adults and 3 children in her home solicited my one 9 year-old to play and entertain her granddaughter (See Exhibit A  .

Respectfully Submitted,

By _____

Curt Lawrence Appearing Pro Se

KS Bar # 17877

69530 Brock Drive

Wyandotte, OK 74370

Phone 918-533-8845

Email: clawrence@sctribe.com

Pro Se

**AFFIDAVIT RE: ESTO TERMINATION OF LEASE LETTER 2/06/23**
**SWORN STATEMENT BY AFFIANT**

Per Section 12) Termination of Lease.  1. I do request a hearing in accordance with the Department's Grievance Procedure. 2. Below is my written reply:

In addition to my written reply, I will provide documentation for substantiation.

RE: "Violation of guests staying at unit and excessive noise causing disruption to peaceful enjoyment for neighbors." According to Kathleen, 10:00 p.m. begins "quiet time." According to Kathleen (and the terms of the lease), a tenant is allowed to have guests as long as they don't stay 3 nights. At absolutely no time, since before Kathleen's letter of 6/24/2025 has any guest stayed more than 2 nights and there has been no excessive noise from my side of the duplex, before or after 10:00 p.m., to my knowledge, although there was a complaint. My childrens mother, Roxanne passed away on 9/24/25 and their grandmother passed away less than 3 months later. My son cared for them and three children in their home. The grandmother had a puppy that was not house-trained and pet odor was one of two reasons DHS said that the kids could not stay overnight there. I know we live in 55 or older housing, but checking the terms of the lease did not occur to me with the funeral, emergency guardianship hearings & DHS. We had NO guests from the time we moved in on August 2022 and did not anticipate any. **The 2 grandchildren began to stay overnight** through the holidays and they have been our ONLY overnight guests. Two or three exceptions were when I paid a caregiver to stay one night when I had to travel to New Mexico and Kansas City. The last time a child stayed more than 2 nights was back in June of 2025. The neighbor had 2 adults and 3 children stay with her for over a month. There was a LOT of disruptive lease violations then, including loud vehicles, kids running around on scooters late in the evening and a LOT of frequent yelling by **them** at **their** children. I moved my car to the street many times because of the kids whizzing down our sidewalk and between the cars on their scooters and I NEVER complained, however Kathleen Blanchard notified me that I could only have two cars at the duplex. There were multiple cars next door, but I have rarely had two cars there and NEVER more. I have a text where the neighbor asked me to let my granddaughter come play with her granddaughter. See Exhibit A. My granddaughter begged me to let her stay beyond 2 nights so that they could play and I gave in. There was so much commotion next door during that time that I figured the rules were relaxed for some reason & later found out that the neighbor had asked permission. (I have screenshots of texts and emails to substantiate this). Kathleen discussed other's complaints about the neighbor with me. The only difference was that I did not complain—people generally consider me as being **reasonable.**

Kathy walks very little and has to have assistance going to the restroom and getting into bed. One night, probably 3 months ago, while I was assisting Kathy, without my knowledge or consent, my grandchildren went outside and were near the huge planter in my driveway. When I noticed they were outside, I went to the door and told them to come in. They protested and I raised my voice and told them to get in immediately! My neighbor spends a lot of time in the garage with the door open and must have been in the garage to have heard me at my front door, because a tribal police officer rang the bell (it was at 8:50 because Kathy checked her watch). The tribal officer said that he stood outside our door listening and didn't hear anything and asked me about it. I explained the same thing I explained above (there should be a documented report). Kathy has advanced Parkinsons

disease and can hardly speak above a whisper, and when I have had a child here (usually only 1), they are in bed before 10:00 p.m. Usually only the 9 year-old girl stays. Kathy's medication wears off and she has to be in bed by 8:30, 9:00 p.m. by the latest. She has to be assisted to the restroom during the night. That was an isolated incident, because the rule is, we don't let child guests play outside unsupervised. In fact, the rule is, we don't allow them outside at all, because of our neighbor exhibiting **unreasonable** behavior. I realize that sound can travel through the walls. The neighbor prior to the current neighbor sometimes had the tv volume excessively loud early in the morning when everything else was quiet (probably 3-4 o'clock) and it awakened us and kept us awake. I sent a polite text to her letting her know and the volume went down that time. I deemed that a **reasonable** action to take, because apparently she wasn't aware and that is what **reasonable** neighbors would do. I didn't call the police or try to get her evicted, in fact, she and I had a very neighborly relationship. Our current neighbor has been known to be a heavy smoker for years and coughs frequently and very loudly at all hours. The neighbor has an office in her garage and talks loudly on the phone, often with the door open. This is what **reasonable** neighbors do, if a neighbor is unaware of a offending noise, a **reasonable** neighbor would make that known and the **reasonable** offender would remedy the matter. Here, our neighbor has imposed a ban on communication, so the offended neighbor, instead of requesting less noise, the offended neighbor "nukes" the offending neighbor by calling the police or seeks eviction of the unknowing offending neighbor, with the potential result of accelerating someone's commitment to a nursing home. That is a more harsh than **reasonable** course of action. There should be a more **reasonable** resolution. The ban on communication was imposed by my neighbor. See Exhibits B & B2. She mentioned that she sets aside a time to grieve the anniversary of her daughter that passed away around 17 years ago. I said I was sorry and placed a sympathy card in her door and got the text message ban in response. I don't question the **reasonableness** of someone's grief, knowing that there are 5-7 widely recognized stages of grief. My son cycles through the anger and depression stages. His wife died at age 37 17 months ago, that is why I help more with her two youngest surviving children. My son helps with Kathy sometimes.

I try to explain to myself the reason that my neighbor's reaction to my home activity is more harsh than empathetic and **reasonable.** I was pleased when our neighbor moved in, we had been friends for years. We would often chat as we encountered each other outside, she jokingly said that we were like Tim and Wilson, neighbors on the sitcom, "Home Improvement." We first became acquainted around 2016 when she worked for me at the Seneca-Cayuga Nation and after she was pressured to resign, I hired her there as an Indian Child Welfare contract worker. Later, I wrote multiple job recommendation letters, and she was hired at an area tribe where we also worked closely together in my role as that tribe's Guardian ad litem. I have never said a harsh or critical word to her (even when she got angry with me and left me stranded at the Tulsa airport) because I know of her unforgiving nature. She imposed a ban on communication for probably a year, before, according to her, her son convinced her to apologize to me.

Regarding the issue of noise external to the neighbor's duplex, I mentioned the 8:50 complaint visit by the ESTOPD officer, I asked Chief Rogers for a report on that complaint and any other complaints. See Exhibit C.

As long as I have known the neighbor, they have lived in stand-alone housing. Prior to the Woodlands, the neighbor lived at Modoc housing. See Exhibit D. There is no adjoining wall, no

adjacent garage to hear outside noises so easily, unlike our duplexes. See Exhibit E. I admit that it has been uncomfortable when our cars are parked a few feet from each other & that is the reason we walk on eggshells and would not dream of making excessive noise and the reason that my guests (most of whom are caregivers) don't go outside except to smoke. That discomfort is likely the reason that "the neighbor" has decided to take every measure to evict me. I would never retaliate, hence I have never before complained about the conditions where her relatives were 10 times noisier and annoying than we ever were. I haven't even crossed the center line of our driveway, except for a couple of times when her trash can was full and the trash truck was pulling up. She frequently doesn't remember her trash and overstuffs her trash can so that it creates a unbelievable fly infestation. When possible, I have put some of her overflow in my can. Early in the morning, we can hear her banging on her wall or slamming doors or drawers. I'm often hard to awaken, but I asked Kathy, who doesn't sleep well and is easily awakened, how often that happens and she said virtually every morning.

Since then, I have years of doing favors for her and she has done some for me. I will provide some texts substantiating the nature of our relationship, including one where she credited me with saving her life when she had a serious health episode just a few months ago. See Exhibit F. She was passing out and called me. I contacted help and had her in an ambulance within 22 minutes. I still believe she had a stroke or something—she spent 2 nights in the hospital. Soon after, her behavior became hostile. I have been concerned and asked a close (mutual friend) relative how she was doing, mentioning that they probably knew we were on longer on speaking terms--their response was, "well, we all have to deal with _____ ." The present **unreasonableness** seems to be the result of a personal vendetta, without regard to any resultant harm to Kathy's health and well-being.

More about Kathy—she is in the late stages of Parkinson's, having had symptoms since 1998. She has declined more in the time we moved to the Woodlands than ever before. She uses a wheelchair and has begun wearing diapers and has to get up to change at least once between midnight and 8 a.m. Her medication runs out in the night and it is difficult getting her to and from the restroom & even more difficult when she is experiencing stress (such as eviction notices). After years of negotiating the duplex, especially getting to and from the restroom, would be very difficult for her to acclimate to another bedroom/bathroom configuration (kind of like changing environments for a blind person). I met Kathy in in Seneca in 1972; she graduated with Ron Wallace. She is experiencing dementia. We have always bickered and she has always been a bit adversarial, so separating idiosyncrasies from symptoms is difficult. I have long noticed that she doesn't seem to comprehend sometimes unless I raise my voice. See Exhibit G. I am aware that in the quiet of the night, sound **outside** the duplex is more noticeable. I don't know much about how conversation travels through the walls, because both the neighbor and the previous neighbor lived alone. She has gotten very hard to understand and communicate with. She is generally exasperating and requires more lifting all the time, I have 2 hernias that I can't have fixed without a couple of weeks of help lifting her.

## CONCLUSION

I found out about the Woodlands when I was the Tribal Administrator at ESTO. I got on the wait list before I won elective office at the Seneca-Cayuga Nation and resigned to serve SCN after Chief Wallace came back from COVID leave. Chief Wallace was who notified me that we were next on

the list. Kathy & I feel privileged to be residents and tried to "walk on eggshells" since receiving the "no contact" text from the neighbor and have resorted to whispering in our adjoining bedroom. I hope I have adequately explained how what seems to be a vendetta started and has grown to the point where she has so little empathy to have no regard to displacing a very sick woman or to my risk of not getting re-elected in June from the publicity of being evicted. I would never retaliate, hence I have never before complained about the conditions where her relatives were 10 times noisier and annoying than we ever were. I don't even cross the center line of our driveway, except for a couple of times when her trash can was full and the trash truck was pulling up. She frequently doesn't remember her trash and overstuffs her trash can so that it creates an unbelievable fly problem. When possible, I have put some of her overflow in my can. Early in the morning, we can hear her banging on her wall or slamming doors or drawers. I'm often hard to awaken, but I asked Kathy, who doesn't sleep well, how often that happens and she said virtually every morning. It is generally applicable law to apply a "reasonable person" standard. I have tried to insert reasonability into weighing the circumstances around our eviction notice.

Affiant Further Sayeth Not

_____
Curt B. Lawrence

Subscribed and sworn to before me, this _13th_ day of February, 2026.

_____
Notary Public

My Commission number: 24002928

My Commission Expires: 03-01-2028

Exhibit A

Can ████ come play for a little bit

████s excited to have a play date

Exhibit B

No, I'm not getting kicked out. I went to Kathleen's office and asked for approval, on a short temporary basis.

I have to tell you that the month of June is very difficult for me, because it's when Shawna passed. I'm doing good to be okay lately


I'm sorry! I understand. I didn't know of the time frame. I wasn't trying to get you riled up. I came home and that was taped to the door.

You don't have to apologize, you didn't know. Thank you though


Thank you!

Thursday June 26 2025

I found your card in my door. Throughout the years, I have found my ways of dealing with it. I've not ever been neighbors with you and I'm not trying to be rude but I like my privacy. I require a lot of alone time and that includes when I go outside. I go outside to enjoy the outdoors by myself and

**View all**                          >


 ok



>   |                              ☺ ⬈

Exhibit B2

7:53 PM, Jun 26

I found your card in my door. Throughout the years, I have found my ways of dealing with it. I've not ever been neighbors with you and I'm not trying to be rude but I like my privacy. I require a lot of alone time and that includes when I go outside. I go outside to enjoy the outdoors by myself and not be interrupted. Occasionally I will chit chat with my neighbors but most of the time I like my privacy. I'm not trying to be rude but felt I needed to explain this as we are neighbors now. Another reason I moved from Modoc housing is all to often when I would go outside someone would try and come over uninvited.



Copy text          Share          More

Exhibit C

## Curt Lawrence

| | |
|---|---|
| **From:** | Roudy Rogers <rrogers@estoo.net> |
| **Sent:** | Friday, February 13, 2026 12:49 PM |
| **To:** | Curt Lawrence |
| **Subject:** | Re: Roudy, I forgot to ask you if I have had any other complaints--have I? |

Nothing comes to mind with us. Any complaints would be policies of housing and would be sent to Kristi, as far as I know.
Sent from my iPhone

On Feb 13, 2026, at 12:29 PM, Curt Lawrence <clawrence@sctribe.com> wrote:

**\*\*\*\* [EXTERNAL EMAIL] Attachments and links may be malicious! \*\*\*\***

Thank you very much and have a great weekend!

Curt Lawrence
918-533-8845

IMPORTANT NOTICE: This e-mail message, including any attachments, is intended only for the recipient(s) named above. It may contain confidential or proprietary information of The Eastern Shawnee Tribe and its related businesses. Unauthorized use, disclosure, or distribution is prohibited. If you have received this message in error, please notify the sender immediately and delete it from your system.

1

EXHIBIT D



EXHIBIT E



Exhibit F

3:51 ✉ 📧 f •                           🔔 ⁑ 5G. 53%▪

‹

Thank you so much!    2:02 PM

Delivered    you are welcome
2:03 PM

Sunday, April 6, 2025

I'm home now, thank you
for everything!  And for
literally saving my life
                            2:32 PM

My sodium levels dropped
to seizure levels and I was
dehydrated
                            2:33 PM    ⌄

>

Paste                              ✕

1  2  3  4  5  6  7  8  9  0

q  w  e  r  t  y  u  i  o  p

a  s  d  f  g  h  j  k  l

⇧  z  x  c  v  b  n  m  ⌫

♡  ✎  ⋖  🗑  ⋮

⦀        ○        ‹

Exhibit G

11:58  🔋 ✉ 🎴 •     📷 📵 📶 76% ▪

‹   Q̇ you some Parkinson's patient   ⊗   ⚏

◆ AI Mode    All    People    Groups    Ever

○ Meta AI                              👍  👎

People with Parkinson's disease often experience communication difficulties, including **changes in speech patterns that can affect loudness and clarity.** This can lead to varying needs for louder directives to comprehend information. Research suggests that individuals with Parkinson's may benefit from tailored communication strategies, such as speaking clearly and at a suitable volume. Some people believe that speaking loudly and clearly can help individuals with Parkinson's understand better, while others think that using simpler language and allowing processing time can be more effective [1].

Parkinson's disease affects each person differently, and communication needs can vary greatly. Some individuals may require louder speech or more frequent repetition to understand, while others may not. Speech-language pathologists work with individuals with Parkinson's to develop personalized communication strategies.

**Effective communication strategies:**

- **Speak clearly and at a suitable volume**
- **Use simple language and short sentences**
- **Allow processing time and avoid interrupting**
- **Use non-verbal cues, such as gestures and visual aids** [2]

By adapting communication approaches to the individual's needs, caregivers and loved ones can

|||          ◯          ‹

7:30  59°  ⊡  •                              📵 ≷ 5G .ıll 54% 🔋

< \* Johnice
4:14 PM, Feb 7

Basically all that happened was jake and kathy
was looking for the tv remote. Jake was out side
smoking Kathy went to the glass door jake said
she couldnt remember the name of her movie, she
said she did... they argured for literally less then 20
seconds about the tv remote. Jake was half way
inside the house Kathy started crying loudy, i went
and gave her hugs .. wandas car was there no one
was out side  it wasn't loud either so Wanda must
have been spying or extreamly close by something



Copy text          Share          More

|||          ◯          <

*Exhibit I*



# EASTERN SHAWNEE TRIBE
# OF OKLAHOMA

**12755 S. 705 Road, Wyandotte, OK 74370**
**Bluejacket Building (918) 666-2435, Fax: 888-971-3905**

February 6, 2026

Curtis and Kathy Lawrence
69530 Brock Dr.
Wyandotte, OK 74370

**RE: Notice of Termination of Lease**

Dear Curtis and Kathy Lawrence,

This letter serves as formal notice that your lease agreement for the property located at 69530 Brock Dr. Wyandotte, OK 74370 in the Woodlands Elder Independent Living Complex will be terminated effective March 31, 2026.  As per lease section 12) Termination of Lease:  the lease may be terminated by the Department at any time by giving written notice.

Reason for termination:  Violation of guests staying at unit and excessive noise causing disruption to peaceful enjoyment for neighbors.  Violation of Lease Section 7: Occupancy of the Dwelling Unit and Resident's Obligations-Maximum occupancy is two (2) people.  Subsection g) to conduct himself/herself and cause other persons who are on the premises with his/her consent to conduct themselves in a manner which will not disturb his/her neighbor's peaceful enjoyment of their accommodations; Subsection o) to have a visitor stay at the unit for a period longer than three (3) days, a written request must be submitted to the Department listing the names of all visitors, number of visitors staying, the day arriving, and the day departing to be approved by the Department.  Violation of the Woodlands Community Rules and Regulations:  General Policies 10) Residents are responsible for the conduct of their guests who are expected to follow the Woodlands Community Rules and Regulations.

Per section 12) Termination of Lease you have the right to make a reply as you may wish or request a hearing in accordance with the Department's Grievance Procedure.  Please send written replies or request for hearing  to the Eastern Shawnee Tribe of Oklahoma Property Management Office within 5 business days.

This letter serves as notice to vacate the property by March 31, 2026.  The property shall be cleaned and returned to its original condition, excluding normal wear and tear.  All keys and property items shall be returned to the Department.

*Exhibit T*

**Curt Lawrence**

| | |
|---|---|
| **From:** | Kristi Laughlin <klaughlin@estoo.net> |
| **Sent:** | Friday, February 27, 2026 5:02 PM |
| **To:** | Curt Lawrence |
| **Subject:** | Re: Grievance Hearing Decision |

Curt,

The certified letter was mailed on Feb. 24, the same day it was emailed.  Your request for email satisfies obligation to provide written response.  The tenancy is being terminated in accordance with the written notice previously served. The termination date remains March 31.

The notice to terminate tenancy was issued in accordance with the terms of the lease agreement and applicable Oklahoma law.  Your grievance was heard, and a decision was made outside the Department to terminate tenancy.  This action is not based on personal matters, prior history unrelated to current lease compliance, or any individual complaint alone.

Since the property location is within Ottawa county jurisdiction, the "appropriate administrative agency" does not apply.  At this time, I will not be engaging in further discussion or debate regarding the notice.

Thank you,

Kristi Laughlin
Eastern Shawnee Tribe of Oklahoma
10080 S. Bluejacket Rd.
Wyandotte, OK 74370
Ph:  918-666-5151 x 1041
Fax: 888-971-3906
klaughlin@estoo.net

---

**From:** Curt Lawrence <clawrence@sctribe.com>
**Sent:** Friday, February 27, 2026 3:59 PM
**To:** Kristi Laughlin <klaughlin@estoo.net>
**Subject:** FW: Grievance Hearing Decision

**\*\*\*\* [EXTERNAL EMAIL] Attachments and links may be malicious! \*\*\*\***

Kristi,

I found this.  Regarding item f—what is ESTO's definition of "appropriate administrative agency?"  I need to know that before going to the "appropriate court."  I know the appropriate court.

Thanks,
Curt

1

A move-out inspection will be conducted within 5 business days of move out. Deductions for damages beyond normal wear and tear will be itemized and the remainder of the security deposit will be forward to you within 30 days of move out. Please provide your forwarding address for the return of security deposit.

Sincerely,

Kristi Laughlin
Tribal Administrator
Eastern Shawnee Tribe of Oklahoma



**EASTERN SHAWNEE TRIBE
OF OKLAHOMA**
ENVIRONMENTAL/LAND MANAGEMENT DEPARTMENT
10080 S. Bluejacket Rd., Wyandotte, OK 74370
Charles Enyart Building (918) 238-5151, Fax: 888-971-3906

## <u>10-DAY NOTICE TO QUIT</u>

June 24, 2025

Curtis and Kathleen Lawrence
69530 Brock Drive
Wyandotte, OK 74370
**RE: 10-DAY NOTICE TO QUIT**

Dear Mr. & Mrs. Lawrence,

This letter serves as formal notice to you to terminate your tenancy at **69530 Brock Drive, Wyandotte, OK 74370**, due to repeated non-compliance with the terms of your lease agreement, specifically No. 7.

The following breaches have been observed:

**Repeated Violation of the Terms of Occupancy:** You have consistently failed to adhere to the occupancy terms set forth in your lease, which are intended to ensure a respectful and safe living environment for all residents, which is designated for Elders **ONLY**.

In accordance with the terms of the lease and applicable laws, you are hereby given ten (10) days from the date of this notice to comply or vacate the premises. The deadline to comply is July2, 2025.

Should you fail, refuse or neglect to comply with the terms of your lease by the specified date, please be advised that we will take all legal action available to remove you from the property.

Thank you for your cooperation.

Kathleen Blanchard

Tribal Realty/Land Use Coordinator

Eastern Shawnee Tribe of Oklahoma

Notice Served By:

Kathleen Blanchard

Witness:

Racy Rogers

Date: 6-24-2025

6-24-2025

A move-out inspection will be conducted within 5 business days of move out.  Deductions for damages beyond normal wear and tear will be itemized and the remainder of the security deposit will be forward to you within 30 days of move out.  Please provide your forwarding address for the return of security deposit.

Sincerely,

Kristi Laughlin
Tribal Administrator
Eastern Shawnee Tribe of Oklahoma

## Curt Lawrence

| | |
|---|---|
| **From:** | Kristi Laughlin <klaughlin@estoo.net> |
| **Sent:** | Friday, February 27, 2026 5:02 PM |
| **To:** | Curt Lawrence |
| **Subject:** | Re: Grievance Hearing Decision |

Curt,

The certified letter was mailed on Feb. 24, the same day it was emailed.  Your request for email satisfies obligation to provide written response.  The tenancy is being terminated in accordance with the written notice previously served. The termination date remains March 31.

The notice to terminate tenancy was issued in accordance with the terms of the lease agreement and applicable Oklahoma law.  Your grievance was heard, and a decision was made outside the Department to terminate tenancy.  This action is not based on personal matters, prior history unrelated to current lease compliance, or any individual complaint alone.

Since the property location is within Ottawa county jurisdiction, the "appropriate administrative agency" does not apply.  At this time, I will not be engaging in further discussion or debate regarding the notice.

Thank you,

Kristi Laughlin
Eastern Shawnee Tribe of Oklahoma
10080 S. Bluejacket Rd.
Wyandotte, OK 74370
Ph:  918-666-5151 x 1041
Fax: 888-971-3906
klaughlin@estoo.net

---

**From:** Curt Lawrence <clawrence@sctribe.com>
**Sent:** Friday, February 27, 2026 3:59 PM
**To:** Kristi Laughlin <klaughlin@estoo.net>
**Subject:** FW: Grievance Hearing Decision

## **** [EXTERNAL EMAIL] Attachments and links may be malicious! ****

Kristi,

I found this.  Regarding item f—what is ESTO's definition of "appropriate administrative agency?"  I need to know that before going to the "appropriate court."  I know the appropriate court.

Thanks,
Curt



**EASTERN SHAWNEE TRIBE**
**OF OKLAHOMA**
ENVIRONMENTAL/LAND MANAGEMENT DEPARTMENT
10080 S. Bluejacket Rd., Wyandotte, OK 74370
Charles Enyart Building (918) 238-5151, Fax: 888-971-3906

## <u>10-DAY NOTICE TO QUIT</u>

June 24, 2025

Curtis and Kathleen Lawrence
69530 Brock Drive
Wyandotte, OK 74370
**RE: 10-DAY NOTICE TO QUIT**

Dear Mr. & Mrs. Lawrence,

This letter serves as formal notice to you to terminate your tenancy at **69530 Brock Drive, Wyandotte, OK 74370,** due to repeated non-compliance with the terms of your lease agreement, specifically No. 7.

The following breaches have been observed:

**Repeated Violation of the Terms of Occupancy:** You have consistently failed to adhere to the occupancy terms set forth in your lease, which are intended to ensure a respectful and safe living environment for all residents, which is designated for Elders **ONLY.**

In accordance with the terms of the lease and applicable laws, you are hereby given ten (10) days from the date of this notice to comply or vacate the premises. The deadline to comply is July2, 2025.

Should you fail, refuse or neglect to comply with the terms of your lease by the specified date, please be advised that we will take all legal action available to remove you from the property.

Thank you for your cooperation.

Notice Served By: ~~Kathleen Blanchard~~

Kathleen Blanchard
Tribal Realty/Land Use Coordinator
Eastern Shawnee Tribe of Oklahoma

Witness: ~~Rosey Rogers~~

Date: 6-24-2025
6-24-2025



10080 South Bluejacket Rd
Wyandotte, OK 74370

Office: (918) 238-5151
Fax: (888) 971-3906

## THE WOODLANDS
### EASTERN SHAWNEE INDEPENDENT LIVING
### RENTAL LEASE

UNIT #:___3___       NO. OF BEDROOMS _2_

1.  DESCRIPTION OF PARTIES AND PREMISES:   The Eastern Shawnee Independent Living Elder Housing Complex (hereinafter called the "Department") does hereby lease to **Curtis & Kathleen Lawrence** (hereinafter called "Resident") the premises located at: **69530 Brock Drive** , **Wyandotte, OK 74370** Beginning **October 20, 2022**  and ending at Midnight on ¡   UNTIL __

    Under the term and conditions stated herein, the premises leased are for the exclusive use and occupancy of the Resident and his/her household consisting of the following named individuals who will reside in the dwelling unit:
    **Curtis Lawrence**
    **Kathleen Lawrence**

2.  AMOUNT AND DUE DATE OF THE RENT PAYMENT:  The lease shall be automatically renewed (except as specified in Section 12) for successive terms of one (1) month at a rental of **$400.00**, payable in advance at the office of the Department on the first (1ˢᵗ) day of each month beginning __**Nov 1st, 2022**__. In the event Resident fails to make said payment within five (5) days of when payment is due, there shall be imposed a late charge of $25.00.  In the event Resident fails to make said payment by the sixth (6) day of when payment is due, Resident will be sent a five (5) day "Notice to Quit" and the Department, at its discretion, may terminate this lease under Section 12 hereof.  This rent will remain in effect unless adjusted in accordance with Section 7 hereof.

3.  DEPOSIT:    Resident will be charged an initial deposit equal to one month's rent. Deposit monies shall be kept in an escrow account for the duration of this lease.  Upon termination of the tenancy, any deposit held by the Department may be applied to the payment of accrued rent and the amount of damages the Department has suffered by reason of the Resident's noncompliance with this Lease.  Any remaining deposit monies

shall be returned to the Resident within 30 days of termination of this Lease.

4. <u>RENTERS INSURANCE</u>:    Resident will be required to maintain and provide proof of renters insurance for the duration of their tenancy.

5. <u>UTILITIES</u>:    Resident will be responsible for all utilities.

6. <u>EQUIPMENT</u>:    The Department agrees to furnish a range, refrigerator, dishwasher, microwave, and washer & dryer, which will remain the property of the Department at all times.

7. <u>OCCUPANCY OF THE DWELLING UNIT AND RESIDENT'S OBLIGATION</u>: Resident agrees not to subject or transfer possession of the premises, and not to give accommodations to boarders or lodgers without the written consent of the Department. Resident further agrees not to use or permit the use of the dwelling unit for any purpose other than a private dwelling unit solely for Resident and the Resident's household (maximum occupancy – 2 people) as identified in this Lease.  This provision does not exclude reasonable accommodation of Resident's guests or visitors.  Resident agrees to abide by such necessary and reasonable regulation as may be determined by the Department for the benefit and well-being of The Woodlands and residents, which shall be posted in the Department's office and incorporated by reference in this Lease. Resident further agrees:

a) To comply with all obligations imposed upon Residents by applicable provisions of building and housing codes materially affecting health and safety;

b) To keep the premises and such other areas as may be assigned to him/her for his/her exclusive use in a clean and safe condition;

c) To dispose of all garbage, rubbish, and other waste from the premises in a sanitary and safe manner;

d) To use only in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning, and other facilities and appurtenances;

e) To refrain from, and to cause his/her household and guests to refrain from, destroying, defacing, damaging, or removing any part of the premises or project;

f) To pay reasonable charges (other than normal wear & tear) for the repair of damages to the project building, facilities, or common areas caused by the Resident, his/her household or guests, and for repair of all damages to the Residents Leasehold;

g) To conduct himself/herself and cause other persons who are on the premises with his/her consent to conduct themselves in a manner which will not disturb his/her neighbor's peaceful enjoyment of their accommodations and will be conducive to maintaining the project in a decent, safe, and sanitary condition;

## The Woodlands Grievance Policy

Date: **10/20/22**  Resident Name(s): **Curtis & Kathleen Lawrence**  Unit: **3**

Address: **69530 Brock Drive, Wyandotte, OK 74370**

Should any individual disagree with The Woodlands Eastern Shawnee Independent Living Elders Complex ("Department") actions or decisions in implementing any of the Department's policies, an appeal may be made through the following grievance policies and procedures:

1. Non-payment of required monthly payments and any legal action resulting therefrom shall not be considered cause for a grievance hearing.

2. To file a grievance, the resident will have to fill out a grievance form which includes the following information:
   a. Date of complaint;
   b. Name of resident;
   c. Nature of complaint, concerns, or grievance;
   d. Date and action taken by the Department;
   e. Date and action taken by the Woodlands Board (if required); and
   f. Dated copy of resolution sent to filing resident.

3. **Grievance Procedure – Step 1 (Department Director)**
   a. Upon receiving written notice of grievance, the Department Director (or designee) may wish to investigate the grievance further before meeting with the aggrieved resident. In any event, the Department Director (or designee) shall arrange to meet with the resident within five (5) working days after notification of the grievance. The Department Director (or designee) may desire to have one other member of the Department staff present at the discussion, although this is not required.
   b. The Department Director's (or designee's) decision shall be conveyed in writing to the resident at the meeting or within ten (10) working days following the conclusion of the meeting. If the grievance is settled at this step, no further action is taken. A copy of the Department Director's (or designee's) decision is retained in the resident's file.
   c. If the resident is not satisfied with the Department Director's (or designee's) decision, the resident may request a hearing before the Woodlands Board.

4. **Grievance Procedure – Step 2 (The Woodlands Board)**
   a. The Woodlands Board shall consider the resident's written appeal of the Department Director's (or designee's) decision in the grievance within ten (10) days after receiving the appeal.

b.  The Department Director (or designee) shall submit all information available from Step 1 to the Board. After review of the information available, the Board may decide to further investigate the grievance and reconsider the decision or they may uphold the decision reached by the Department Director (or designee) in Step 1.

c.  If the Board desires to investigate the grievance further, they may request the resident, the Department Director (or designee), and any other staff or witnesses to appear before them. A final decision by the Board should be determined by a majority vote with a quorum of the Board present.

d.  The Board's decision shall be conveyed in writing to the resident within five (5) working days following the conclusion of the grievance hearing in which disposition of the cause is determined, with copies distributed to the Department Director (or designee) for inclusion in the resident's file.

e.  The Board's action will be considered as satisfying the Department's obligation regarding the consideration of resident grievances.

f.  If the resident desires further action, s/he may exercise his/her rights to present his/her case before the appropriate administrative agency or before the appropriate court.

_____
Resident

10-18-2022
Date

_____
Resident

10-18-2022
Date

(a) The Resident agrees that no member of the Resident's household, including him or herself, or their guests engages in:

    (1) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents; or

    (2) Any drug related criminal activity on or off the premises.

(b) The Resident agrees that no guest of the Resident, or other person under the Resident's control, shall engage in:

    (1) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents; or

    (2) Any drug related criminal activity on the premises.

(c) The Resident agrees that no member of the household shall engage in an abuse or pattern of abuse of alcohol that affects the health, safety, or right to peaceful enjoyment of the premises by other residents.

(d) Any drug-related or criminal activity in violation of this term will be treated as a serious violation of the material terms of the lease.

(e) The Resident hereby acknowledges that evictions are civil, not criminal matters. Whereby, in order to terminate a lease and evict a tenant, a criminal conviction or arrest is <u>not</u> necessary, and the Department need not meet the criminal standard of "proof beyond a reasonable doubt" in eviction proceedings.

The undersigned understands and accepts the provisions of the Department's "One Strike, You're Out" Policy:

_____        10-18-22
Resident                                   Date

## 9. DEPARTMENT'S OBLIGATION ON MAINTENANCE AND REPAIR:

A. The Department agrees to keep the building facilities, common area, and ground not otherwise assigned to the Resident for maintenance and upkeep, in a clean and safe condition, and to make necessary repairs to the premises. The Department will be responsible for mowing the grounds. The Department further agrees:

    1) To comply with requirements of applicable building codes and housing codes materially affecting health and safety;

    2) To maintain in good and safe working order and condition electrical, plumbing, sanitary, heating, ventilation, and other facilities and appliances;

    3) To provide and maintain appropriate receptacles and facilities (except containers for the exclusive use of an individual resident family) for the deposit of ashes,

3) To provide and maintain appropriate receptacles and facilities (except containers for the exclusive use of an individual resident family) for the deposit of ashes, garbage, rubbish, and other waste removed from the premises by the resident in accordance with paragraph (b) of this Section; and

4) To maintain the premises and project in a decent, safe, and sanitary condition.

B. The Department may authorize a Resident, by "Written Rider" hereto specifying the task to perform seasonal maintenance or other maintenance tasks, as permitted by the nature of the design and construction of the dwelling and according to local custom, provided that such agreement is made in good faith and not for the purpose of evading the obligations of the Department.

10. DEFECTS HAZARDOUS TO LIFE, HEALTH AND SAFETY: When conditions are created which are hazardous to the life, health, or safety of the occupants, the Resident shall immediately notify the Department of the damage. The Department shall be responsible for the repair of the unit within a reasonable time, provided, that if the damages were caused by the Resident, Resident's household or guests, the reasonable cost of repairs shall be charged to the Resident, payable on the first day of the second month following the month the charges are made.

If repairs of the defect or damage cannot be made within a reasonable time, the Department shall offer alternative accommodations, if available. In the event the Department fails to fulfill its responsibility, the Resident's rent shall abate in proportion to the seriousness of the damages and loss in value as a dwelling. Rent shall not abate if the Resident rejects the alternative accommodations or if the damages were caused by the Resident, Resident's household, or guests.

11. INSPECTION: Before occupancy by the Resident, the Department, the Resident, and his/her representative shall inspect the dwelling unit and the Resident will receive a written statement of the condition of the unit and the equipment furnished therein. Once a month, Department personnel will be entering the unit to check smoke alarms, change air filters, and check GFI receptacles. Resident agrees that the authorized agent, employee, or representative to the Department will be permitted to enter Resident's dwelling unit. Such entry may be made only during reasonable hours after an advance notice to the Resident of the time, date, and purpose; provided, however, the Department shall have the right to enter Resident's dwelling unit without prior notice to Resident, if the Department reasonably believes that an emergency exists which requires such entry and for pest control. The Department shall leave on the premises a written statement specifying the date, time, and purpose of entry prior to leaving the premises. These notices in writing do not apply when entry is made at the request of Resident or for pest control.

When the Resident vacates, the Department inspects the dwelling unit and gives the Resident a written statement of the charges, if any, for which the Resident is responsible. Resident and/ or his/her representative may join in such inspection.

12.    TERMINATION OF LEASE:  This Lease may be terminated by the Department at any time by giving a written notice.  Notice may only be given for serious or repeated violations of material terms of Lease, such as failure to make payments due under the Lease or to fulfill the Resident's obligations, or for other good cause.  If the Department should elect to terminate this Lease, the Written Notice of Termination must be given:

1)  Five (5) days in advance in the case of failure to pay rent;

2)  A reasonable time depending on the seriousness of the situation in the case of creation or maintenance of a threat of safety of any person or the premises; and

3)  Thirty (30) days in all other cases.

The notice of termination to the Resident shall state reason for termination and shall inform the Resident of this right to:

1)  Make such reply as he/she may wish; and

2)  Request a hearing in accordance with the Department's Grievance Procedure.

THE RESIDENT MAY TERMINATE THIS LEASE AT ANY TIME BY GIVING THIRTY (30) DAYS WRITTEN NOTICE.  IF THE RESIDENT DOES NOT GIVE THE DEPARTMENT THIRTY (30) DAYS NOTICE, THE DEPARTMENT MAY CHARGE THE RESIDENT THIRTY (30) DAYS RENT FROM THE DATE OF ACTUAL MOVE-OUT.

Notice by either party to this Lease may be given on any day of the month.

13.    LEGAL NOTICE:    Any notice required hereunder shall be sufficient if delivered in writing to Resident personally or to an adult member of his/her family residing in the dwelling unit, or if sent by certified mail return receipt properly addressed, to Resident.  Notice to the Department must be in writing and either delivered to the office of the Department or sent to the Department by prepaid, first class mail.

14.    GRIEVANCE PROCEDURE:        All grievances or appeals arising under this Lease shall be processed and resolved pursuant to the Grievance Procedure of the Department, which procedures are kept in the Department's office.

15.    KEYS:        There shall be a replacement charge imposed upon a Resident who loses a key or fails to return all keys at the termination of this Lease.  This fee shall be taken out of the deposit and applies to all exterior door keys and automatic garage door openers.

16. COUNSELING OBLIGATIONS: Resident agrees and is obligated to attend mandatory Move-In Orientation, and upon written notification to Resident by the Department any Conflict Resolution counseling.

17. CHANGE: This Lease, including any future adjustment of rent or dwelling unit is the entire agreement between the Department and Resident. No change herein shall be made except by a "Written Rider," signed and dated by both parties, other than with respect to the "Notice of Rent Adjustment."

IN WITNESS WHEREOF, The parties have executed this Lease Agreement this __18th____ day of **October** , **2022** at Wyandotte, Oklahoma.

EPA DEPARTMENT

BY _Kathleen Blanchard_
TRIBAL REALTY/LAND USE COORDINATOR

_____
RESIDENT

_____
RESIDENT

**The Woodlands Grievance Policy**

Date: **10/20/22**                Resident Name(s): **Curtis & Kathleen Lawrence**        Unit: **3**

Address: **69530 Brock Drive, Wyandotte, OK 74370**

Should any individual disagree with The Woodlands Eastern Shawnee Independent Living Elders Complex ("Department") actions or decisions in implementing any of the Department's policies, an appeal may be made through the following grievance policies and procedures:

1.  Non-payment of required monthly payments and any legal action resulting therefrom shall not be considered cause for a grievance hearing.

2.  To file a grievance, the resident will have to fill out a grievance form which includes the following information:
    a.  Date of complaint;
    b.  Name of resident;
    c.  Nature of complaint, concerns, or grievance;
    d.  Date and action taken by the Department;
    e.  Date and action taken by the Woodlands Board (if required); and
    f.  Dated copy of resolution sent to filing resident.

3.  **Grievance Procedure – Step 1 (Department Director)**
    a.  Upon receiving written notice of grievance, the Department Director (or designee) may wish to investigate the grievance further before meeting with the aggrieved resident. In any event, the Department Director (or designee) shall arrange to meet with the resident within five (5) working days after notification of the grievance. The Department Director (or designee) may desire to have one other member of the Department staff present at the discussion, although this is not required.
    b.  The Department Director's (or designee's) decision shall be conveyed in writing to the resident at the meeting or within ten (10) working days following the conclusion of the meeting. If the grievance is settled at this step, no further action is taken. A copy of the Department Director's (or designee's) decision is retained in the resident's file.
    c.  If the resident is not satisfied with the Department Director's (or designee's) decision, the resident may request a hearing before the Woodlands Board.

4.  **Grievance Procedure – Step 2 (The Woodlands Board)**
    a.  The Woodlands Board shall consider the resident's written appeal of the Department Director's (or designee's) decision in the grievance within ten (10) days after receiving the appeal.

b.  The Department Director (or designee) shall submit all information available from Step 1 to the Board.  After review of the information available, the Board may decide to further investigate the grievance and reconsider the decision or they may uphold the decision reached by the Department Director (or designee) in Step 1.

c.  If the Board desires to investigate the grievance further, they may request the resident, the Department Director (or designee), and any other staff or witnesses to appear before them.  A final decision by the Board should be determined by a majority vote with a quorum of the Board present.

d.  The Board's decision shall be conveyed in writing to the resident within five (5) working days following the conclusion of the grievance hearing in which disposition of the cause is determined, with copies distributed to the Department Director (or designee) for inclusion in the resident's file.

e.  The Board's action will be considered as satisfying the Department's obligation regarding the consideration of resident grievances.

f.  If the resident desires further action, s/he may exercise his/her rights to present his/her case before the appropriate administrative agency or before the appropriate court.


_____
Resident

10-18-2022
Date


_____
Resident

10-18-2022
Date

## The Woodlands Pet Agreement

Date:**10/20/22**        Resident Name(s):**Curtis & Kathleen Lawrence**        Unit:___**3**____

Address:_____**69530 Brock Drive, wyandotee, OK 74370**_____

1. **Screening/Registration**

   The Eastern Shawnee Independent Living Elders Complex ("Department") must be notified of any pets before the resident occupies the unit.  A screening should be arranged with the Department to screen the temperament of the pet.  It is in the sole discretion of the Department to determine whether any pet poses any threat to the health, safety, or welfare of The Woodlands community.

2. **Deposit and Rent**

   A refundable deposit of **$100.00** is required as additional security deposit for any pet.  This amount will be added to any existing security deposit and will secure all of resident's obligations under the rental contract and this pet agreement.  An additional amount of **$10.00** a month will be charged for a first pet, and an additional amount of **$20.00** a month will be charged for a second pet.

3. **Terms**

   The resident agrees to the following:

   a.  Only the following described pets will reside in my unit:_____. Pet sitting a pet not covered by Resident under this agreement will be considered a violation of Department policy.

   b.  All pets must be properly licensed and have shots required by statute or regulation at all times.

   c.  No pet with a history of aggressive, threatening, or violent behavior will be allowed.  At the Department's discretion, and pursuant to Section 1, breeds with a disposition for aggressive behavior may be prohibited.

   d.  Pets shall not be kept, bred, or used for any commercial purpose.  All pets must be spayed or neutered by six months of age. If the procedure is deemed medically unsafe by a veterinarian before six months of age, pets must be spayed or neutered at the earliest available time.

   e.  Pets will not be allowed out of resident's unit except when being carried or when on a leash under resident's control.

   f.  Pets will not be chained or tied in any way outside or to the exterior part of the building.

   g.  Resident will be responsible for immediately cleaning up after their pet(s) and discarding securely bagged pet droppings.

   h.  Pets will not be allowed to make noise or engage in threatening conduct which might disturb other residents or other pets.

   i.  Pets will be kept clean.  Any pet waste that is accumulated in a tray inside the unit will be disposed of properly and promptly.

j.  Resident will immediately notify the Department of any personal injury or property damage caused by their pet(s).
k.  Resident will promptly pay for any damage attributed to their pet(s).
l.  The maximum adult weight/size is <u>20 lbs</u>.
m.  The maximum number of pets allowed in the unit is <u>2.</u>
n.  Resident, any guest, or invitee shall indemnify, defend, and hold the Department, the Department's agents, and employees harmless from and against any action, suits, claims, and demands (including legal fees, costs, and expenses) arising from damage or injury to any person or property of others by any pet owned, kept, housed, or maintained by the Resident, his/her guest, or invitee.

4.  **Enforcement Policy**

Any resident or Department agent observing an infraction of these rules shall discuss the infraction in a neighborly fashion with the pet owner in an effort to secure voluntary compliance. If the complaint is not resolved, it must be put in writing, signed, and presented to the Department. If the Department is in agreement with such complaint, the pet owner will receive written notice of the violation.

If upon the <u>third</u> violation the problem is still unresolved, arrangements will be made for a hearing. (At the Department's discretion, immediate arrangements for a hearing may be made if the nature of the complaint involves personal injury or the imminent threat thereof). The Department may require the permanent removal of any pet, if such pet is determined by the Department to be a nuisance or a danger to The Woodlands community and its residents. If so determined, the pet owner will have **30 days** to remove the pet from the premises.

5.  **Service Animals**

Registered service animals are subject to all rules and regulations of the Woodlands Pet Policy. **However, a weight limit shall not be placed on registered service animals.**

I clarify that my pet(s) has no history of aggressive, threatening, or violent behavior and I agree to the above provisions.

_____      10/18/2022
Resident                              Date

_____      10/18/2022
Resident                              Date

_____      10/18/2022
Department/Agent                      Date

## The Woodlands Safety Addendum

Date: __10/20/22__    Resident Name(s): __Curtis & Kathleen Lawrence__    Unit: __3__

Address: __69530 Brock Drive, Wyandotte, OK 74370__

**WARNING:** Areas of The Woodlands Eastern Shawnee Elders Independent Living Complex ("Department") may pose dangers to unattended children who may not be aware of the risks. The Department and its agents cannot be responsible for watching and supervising children's activities. THEREFORE, PARENTS AND THOSE PERSONS HAVING CARE, CUSTODY, OR CONTROL OF CHILDREN ARE RESPONSIBLE FOR THE SUPERVISION, SAFETY, AND WELL-BEING OF THOSE CHILDREN. Following are some areas that may pose special dangers to children. This list is not meant to cover all possible dangers that may be present.

### Windows

- Open windows present a potential risk of harm to children.
- Window screens are intended solely to keep bugs out. They are not intended to support a person's weight or prevent a person from falling from an open window.
- There is a risk of serious injury or death if a person leans against a screen.
- Parents and custodians must keep their children from sitting or playing on window sills, and keep windows shut and locked when children are left unattended for child safety.
- Keep furniture or other objects on which a child can climb away from windows.
- Window stops and other devices that restrict a window from opening are not provided by the Department because of the dangers associated with fire and the ability of occupants to escape. If the resident desires to use such devices, they must be approved by the Department before being installed. The resident accepts full responsibility for the safe use of such devices.
- Do not block windows in any way that would prevent exit in event of a fire.

### Use of Appliances

- Stoves, ovens, and fireplaces can cause burns and start fires if not properly used and attended.
- Hot water can cause burns if not properly used and attended.
- Children can turn on stove burners and ovens. Never place anything on stove burners or in the oven except when actually cooking.
- Never allow anything, except appropriate plugs, to be placed in electrical sockets.

### Parking Areas

- Moving vehicles can cause serious injury or death.
- Small children are hard to see around vehicles.
- Playing in or around vehicles is dangerous.

## Water

- Any area where water pools more than 1 inch deep poses the risk of drowning.
- Danger can be present with bathtubs, sinks, buckets, fountains, streams, and ponds.

Resident _____    Date  10/18/22

Resident _____    Date  10/18/22

## The Woodlands Community Rules and Regulations

Date: **10/20/22**          Resident Name(s): **Curtis & Kathleen Lawrence**       Unit: **3**

Address: **69530 Brock Drive, Wyandotte, OK 74370**

### Definition of Community Rules & Regulations

As presently adopted, subsequently amended, or modified, these Woodlands Community Rules & Regulations are incorporated into the Rental Lease executed or renewed this date and apply to all residents, their family, and/or guests. Each Resident is responsible for ensuring that his/her family and guests know and follow the Woodlands Community Rules & Regulations. Management of The Woodlands Eastern Shawnee Elders Independent Living Complex shall be referred to as the "Department."

### General Policies

1. Entry areas, patios, and backyards are not storage areas. Areas visible to the outside must be kept neat and free of clutter: no trash, laundry, broken furniture, dead plants, empty boxes, storage items, or unsightly objects are allowed in these areas.
2. Common entrances, passageways, or driveways must not be obstructed or used by residents for any purpose, other than entrance and departure.
3. Garbage cans, household supplies, bottles and cans, and other similar articles shall not be placed outside the unit.
4. No part of the common areas will be used for commercial activities of any kind.
5. No structure of a temporary character, trailer, tent, shack, barn, or other building will be allowed in the common areas at any time.
6. Modifications to the unit or any common area are prohibited without the Department's prior written approval.
7. All maintenance requests must be submitted to the Department in writing.
8. Excessive noise is not allowed.
9. Quiet time begins at 10 pm.
10. Residents are responsible for the conduct of their guests who are expected to follow the Woodlands Community Rules & Regulations.
11. No alcoholic beverages are to be consumed in the common areas.
12. No resident shall cause or permit anything, including but not limited to, signs, awnings, canopies, shutters, radio or television antennas, satellite dishes, or air conditioners to be displayed or affixed to the unit unless allowed by written approval by the Department.
13. Nothing shall be done in any unit, or in common areas, which will impair the structural integrity of the building.
14. Barbeques are not allowed within 10 feet of the unit or combustible construction.

## Individual Units

1. No Venetian blinds, awnings, draw shades, or non-conforming curtains or drapes shall be installed on exterior windows without the written permission of the Department. This includes reflector shades, tin foil, etc.
2. No painting, staining, or papering shall be done without the prior written permission of the Department.
3. Picture hooks are to be used for hanging pictures, mirrors, or decorative items on the wall. Adhesive materials are not allowed.
4. Residents shall not conduct or permit the noisy use of any musical instrument, operation of radio/s (including vehicular stereo or radio), television, amplifier, or loud speakers in a manner which disturbs other residents.

## Pets

Pets are permitted and are subject to appropriate fees. A Pet Agreement must be completed and signed. Residents are responsible for any and all damage caused by their pet. Guests' pets are not allowed. The only pet allowed is the pet listed on your rental agreement.

## Trash Collection and Removal

1. All trash, garbage, and rubbish will be disposed of properly in approved receptacles and will not be stored in or around any unit.
2. All trash from your unit should be bagged, sealed or tied, and placed in a trash can.
3. Do not place any burning materials or hazardous chemicals in your trash can.
4. Do not place old furniture, broken toys, etc. outside for pick-up. Residents are responsible for the removal of such items.
5. All wet garbage must be wrapped.
6. Boxes must be crushed before being placed in trash cans.
7. The Department will pick up trash once a week. Residents are responsible for having their trash placed at the designated pick-up location on time each week.
8. Residents are encouraged to recycle at designated stations provided by the Department.

## Insurance

1. No resident shall keep or do anything in any unit or common area which will increase the rate of insurance on the building or contents beyond that customarily applicable for residential use.
2. No resident shall permit anything in any unit or common area which will result in the cancellation of insurance on any building, or its contents, or which would be in violation of any federal, state, tribal, county, or city regulatory authority.
3. The Department is not responsible for personal property left outside the unit.
4. **INSURANCE REMINDER:** The Department's building insurance does not cover the contents of your unit or personal liability. **Residents are required to maintain and provide proof of rental insurance for the duration of their tenancy.**

## Security

Security is very important to all residents living at The Woodlands.

1. Should anything suspicious occur, report it to the police and the Department.
2. Use all locks on doors and windows.

## Enforcement

All violations and complaints must be submitted to the Department in writing.

I have read, understand, and agree to comply with these Rules & Regulations, including any future changes of which I receive written notice.

_____
Resident

10/18/22
Date

_____
Resident

10/18/22
Date

## The Woodlands Surviving Spouse Policy

Date: **10/18/22**      Resident Name(s): **Curtis & Kathleen Lawrence**      Unit:    **3**

Address:              **69530 Brock Drive, Wyandotte, OK 74370**

The Woodlands Eastern Shawnee Independent Living Elders Housing Complex is designed and intended to benefit the quality of life for our Tribal elders and the elders of our community. It is the policy of the Eastern Shawnee Tribe of Oklahoma to apply Tribal preference to all applicants. Eastern Shawnee Tribal citizens will be given first preference, other tribal citizens will be given second preference, and all other applicants will be considered third.

In the event that a unit is rented to an Eastern Shawnee citizen, tribal preference shall carry over to their surviving spouse. Thus, in the event that a citizen spouse predeceases their non-citizen spouse, the surviving spouse may continue to live at The Woodlands pursuant to the terms and conditions of their Rental Lease. This policy is limited to the surviving spouse only. In the event of remarriage or co-habitation, the surviving spouse will need to submit a new application and will be treated as a new-application and subject to applicable Tribal preference criteria.

**NOTE:** No gaming funds have been used to build or maintain the Woodlands Eastern Shawnee Independent Living Elders Housing Complex. For this reason, the Eastern Shawnee Tribe of Oklahoma is able to implement this Surviving Spouse Policy without violating any federal statute.

_____
Resident

10/18/22
Date

_____
Resident

10/18/22
Date